UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:23-CR-51-TAV-JEM |
| | ) | |
| DANIEL MICHAEL ROSE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This criminal matter is before the Court for consideration of the Report and Recommendation ("R&R") entered by United States Magistrate Judge Jill E. McCook on September 23, 2025 [Doc. 90]. The R&R addresses defendant's three motions to suppress evidence: (1) Motion to Suppress All Evidence from the Search of 2309 Dodson Avenue on January 20, 2023, and Motion to Suppress All Evidence Obtained from the Seizure and Search of a Blue Apple iPhone [Doc. 42]; (2) Request for a *Franks* Hearing [Doc. 63]; and (3) Motion to Suppress Statements [Doc. 66]. On December 2, 2024, Judge McCook held a motion hearing [Doc. 72]. Judge McCook then issued the R&R [Doc. 90], recommending that the Court deny defendant's motions to suppress [Docs. 43, 63, 66]. After receiving an extension [*see* Doc. 95], defendant filed objections to the R&R [Doc. 96], and the government responded [Doc. 97]. Thus, the matter is now ripe for review. *See* E.D. Tenn. L.R. 7.1(a). For the reasons below, the Court **ACCEPTS** and **ADOPTS** the R&R [Doc. 90] in whole and **DENIES** defendant's motions to suppress [Docs. 42, 63, 66].

## I.      Background

The Court presumes familiarity with the summary of the evidence and findings of fact as set forth in the R&R [*See* Doc. 90, pp. 3–28].  Defendant has lodged an objection as to the absence of findings of fact regarding the search of the safe in this case [*See* Doc. 96, p. 13].  Nonetheless, given the Court's rulings *infra*, the Court reincorporates the R&R's findings of fact[1] as is below:

> Around 6:30 p.m., on January 20, 2023, KPD Officer Austin Jordan and five other officers from the CERT squad went to the residence of Defendant Daniel Rose to arrest him on a warrant for theft of a firearm and to conduct a parole compliance check.  Defendant's parole officer PO Michelle McCord planned to accompany the squad that evening but she became ill and had to cancel.  Officer Jordan went to the front porch of the residence, while the other officers stationed themselves around the side and back of the house.  A child answered the door, and then Sierra Netherland, Defendant's girlfriend and the homeowner, came to the door.  Officer Jordan could see a black male seated in the living room.  Ms. Netherland said Defendant was not home and the man in the living room was not Defendant.  When Officer Jordan stated he was there to perform a parole compliance check, Ms. Netherland said she would check to see if Defendant was in the bathroom.  Officer Jordan asked to come inside, but Ms. Netherland said she needed to secure her dog and she shut the door.
>
> While waiting outside the residence, Officer Johnson, who was standing by the side of the house, said he could see a black male with a beard sitting in the living room.  Officer Jordan relayed that Ms. Netherland said that man was not the Defendant.  An officer stationed on the side of the house stated that he could see Defendant coming to the door.
>
> A little over one minute after Ms. Netherland shut the door, Defendant came out of the residence through the front door and onto the porch.  Officer Jordan confirmed Defendant was on parole, stated the officers were there to do a parole compliance check, and told Defendant that PO McCord could not be there.  Defendant agreed everything was fine and denied the residence

---

[1]  As referenced herein, "KPD" refers to Knoxville Police Department, "CERT" refers to Community Engagement Response Team, and "PO" refers to Parole Officer.  Additionally, *Miranda* refers to *Miranda v. Arizona*, 384 U.S. 436 (1966).

contained anything about which the officers should be concerned. The officers then arrested Defendant pursuant to the arrest warrant, handcuffed him, and searched him, seizing his wallet and cell phone. Officer Jordan escorted Defendant to his patrol car, which was parked a short distance from the residence, while Officers Chandler and Johnson entered the residence. Upon entering the residence, Officer Chandler asked Ms. Netherland, whose room was the right front bedroom, and she stated that it was her room.

While walking Defendant to the patrol car, Officer Jordan informed Defendant of his charges. When Defendant asked if there was a search warrant for his residence, Officer Jordan informed him that his residence was being searched because he had agreed to a search without cause as part of his parole conditions. Officer Jordan placed Defendant in his patrol car. When Defendant asked if he could talk with Ms. Netherland and have a cigarette, Officer Jordan said Defendant had to sit in the patrol car due to his prior experience with Defendant two years ago when Defendant drove away in a pickup truck while dragging him. Officer Jordan said Defendant was not allowed to smoke in his patrol car, but he would let Defendant talk with Ms. Netherland through the window. Officer Jordan then read the *Miranda* rights to Defendant from a card. Defendant indicated that he understood the *Miranda* rights, remarking, "Yeah, a lawyer" but then denied that he wanted a lawyer when Officer Jordan asked if he wanted one. Officer Jordan informed Defendant that he was arrested on an indictment alleging that he stole a firearm while at someone's apartment. He then asked Defendant about that offense, and Defendant denied knowing anything about it.

Officer Jordan returned to the residence where a search was in progress. He met Officer Johnson near the back of the house, and Officer Johnson said he saw Defendant exiting from there, indicating the back right bedroom. Officer Jordan saw the door to the attic located in the ceiling of that bedroom was not completely closed. Officer Jordan climbed up to the attic and located a shotgun in a case. He later confirmed the shotgun was not the stolen firearm. The officers did not seize the shotgun, which Ms. Netherland said belonged to a family member.

Officer Jordan then assisted officers searching the right front bedroom. He located a black backpack partially concealed in a laundry hamper. The backpack contained suspected drugs and drug trafficking paraphernalia. Another officer located a safe in a dresser in the bedroom. Ms. Netherland told the officers that the safe belonged to Defendant, who could open it with his finger. Officers seized the safe. An officer also located a gun believed to be the stolen firearm in the front bedroom. Lieutenant Chadwell directed

3

Officer Jordan to contact Defendant's parole officer regarding his parole violations. Officer Jordan attempted to call PO McCord, who did not answer.

Officer Jordan transported Defendant to the Organized Crime Unit office and questioned Defendant in his patrol car outside that office. Defendant declined to answer questions because Officer Jordan could not make a deal with him. Officer Jordan confirmed that neither he nor any police officer could make a deal with Defendant and that Defendant would have to talk with the prosecutor. The transport officers arrived to take Defendant to jail, and one of the transport officers removed Officer Jordan's handcuffs from Defendant and replaced them with different handcuffs. Officer Jordan informed Defendant that he was seizing the money from Defendant's wallet as drug proceeds and asked Defendant to sign the forfeiture notice. Defendant said that money was for his family. Officer Jordan remarked that individuals who overdose on heroin have families, too. Defendant responded that he did not "spoon feed" or "force-feed" heroin to anyone.

Officer Jordan and Defendant then discussed the prior "dragging" incident. Defendant denied dragging Officer Jordan. Officer Jordan said in a previous encounter, Defendant was preparing to drive away while he was standing on the rail and leaning partially inside Defendant's truck. Defendant denied that Officer Jordan was in or on his truck and said Officer Jordan's partner was pointing a gun at him and telling him not to move.

When Officer Jordan returned to the police station for his next shift on the afternoon of January 21, 2023, he prepared an affidavit for a search warrant for the safe seized from Defendant's residence. Officer Jordan obtained the search warrant at 7:26 p.m. and searched the safe immediately thereafter. He seized a firearm, a firearm magazine, and suspected heroin and cocaine from the safe.

[Doc. 90, pp. 25–28].

Defendant first moves to suppress all of the evidence seized from the search of 2309 Dodson Avenue, including that which was contained in the safe, and all of the evidence obtained from the seizure and search of his cell phone [Docs. 42, 63]. In support of his motion, defendant contends that consent is required under his search condition [Doc. 63, p. 4], and that "Tennessee's absence of judicial or statutory safeguards should result with

4

the establishment of a minimum safeguard of at least reasonable suspicion when determining the constitutionality of a warrantless search of a parolee under the totality of the circumstances" [*Id.* at 6]. Moreover, defendant argues that the search of 2309 Dodson Avenue was unreasonable and merely a "subterfuge" to allow law enforcement "to circumvent even minimal Amendment Fourth Amendment protections" and search for an alleged stolen firearm [*Id.* at 6–7]. As to his cell phone, defendant submits that the affidavit does not give rise to the required probable cause after excluding "the illegally obtained evidence forming the bases for the allegations" [Doc. 42, p. 8].

Defendant also requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1968) [Doc. 63], asserting that Officer Jordan's affidavit in support of a search warrant for the safe and Officer Chandler's affidavit for the search of defendant's cell phone contain multiple false statements and material omissions that are necessary to probable cause [*Id.* at 8, 10–18]. Lastly, defendant moves to suppress the statements he made to law enforcement [Doc. 66], specifically the statement that he does not "force feed" or "spoon feed" heroin to anyone [*Id.* at 1–2]. Defendant contends that, at the time he made this statement, he was in custody, he had not validly waived his right to be free from self-incrimination, and Officer Jordan "knew or should have known that his words . . . were reasonably likely to illicit an incriminating response" from defendant [*Id.* at 3].

The government responds in opposition to defendant's motions [*See* Docs. 50, 69, 70].

Upon consideration of the record and the parties' arguments, Judge McCook has recommended that defendant's motions [Doc. 42, 63, 66] be denied. First, Judge McCook

concluded that the search of defendant's residence was reasonable based on the totality of the circumstances and comported with the Fourth Amendment [Doc. 90, pp. 29–37]. Second, Judge McCook determined that probable cause supported the issuance of the search warrants for the safe and defendant's cell phone [*Id.* at 37–51, 65]. Third, Judge McCook found that a *Franks* hearing was not warranted in this case [*Id.* at 51–59]. Finally, regarding defendant's statement that he did not "force feed" or "spoon feed" heroin to anyone, Judge McCook concluded that such statement was voluntary and made after defendant waived his *Miranda* rights. [*Id.* at 51–64].

## II. Standard of Review

The Court reviews *de novo* those portions of the R&R to which a defendant has objected. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). Accordingly, the Court considers defendant's motions, the government's responses, the hearing transcript, the R&R, defendant's objections, and the government's response to those objections, all in light of the applicable law.

Objections to any part of a magistrate judge's disposition "must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *See Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995); *see also Thomas v. Arn*, 474 U.S. 140, 147 (1985) (stating that the purpose of the rule is to "focus attention on those issues . . . that are at the heart of the parties' dispute"). Each objection to a magistrate judge's recommendation should describe how the analysis is wrong, why it was wrong, and how *de novo* review warrants a different result on a particular issue. *See Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). A general objection that

6

merely restates an argument previously presented or simply voices a disagreement with a magistrate judge's suggested resolution "has the same effect[] as would a failure to object." *Austin v. Comm'r of Soc. Sec.*, No. 1:19-cv-2380, 2021 WL 1540389, at *4 (N.D. Ohio, Apr. 19, 2021) (citation omitted); *see also United States v. Dawson*, No. 4:19-cr-206, 2020 WL 109137, at *1 (N.D. Ohio, Jan. 9, 2020) (citations omitted) ("[T]he Court is under no obligation to review *de novo* objections that are merely an attempt to have the district court reexamine the same arguments set forth in the petition and briefs.").

## III.    Analysis

Defendant makes five overall objections to the R&R.[2]  First, as to the search of the residence, defendant objects to the R&R's conclusion that the search was reasonable in consideration of the totality of the circumstances [Doc. 96, p. 2].  Second, as to the search of the safe, defendant objects to the R&R's absence of findings of fact and conclusions of law as to his assertion that Officer Jordan searched the safe before obtaining a warrant [*Id.* at 13].  Furthermore, defendant objects to the extent the R&R concludes that the safe was not opened until after a search warrant was obtained [*Id.*].  Third, as to the search of his cell phone, defendant objects to the finding that a nexus exists and that the good-faith exception applies [*Id.* at 16].  Fourth, defendant objects to the R&R's conclusion that he failed to make a substantial preliminary showing regarding the affidavits of Officer Jordan and Officer Chandler to warrant a *Franks* hearing [*Id.* at 19].  Finally, defendant objects to

---

[2]  The Court acknowledges that defendant has more objections within these five, outlined objections.  The Court will discuss these internal objections under the respective, general objection within which they fall.

the conclusion that his statements to Officer Jordan were voluntary and not part of an interrogation [*Id.* at 21].

In response, the government primarily argues that the Magistrate Judge came to the correct conclusions of law after analyzing the facts of this case [Doc. 97].

### A. Search of the Residence

Beginning with the search of the residence, defendant objects to the R&R's conclusion that the search of the residence was "reasonable in consideration of the totality of the circumstances based simply upon a search condition relied upon by the government that permitted the search of [defendant's] person and residence without suspicion" [Doc. 96, p. 2].

### 1. Consent and Reasonable Suspicion

Defendant begins by objecting to the R&R's characterization of his argument as *requiring* reasonable suspicion or consent of the parolee to conduct a parole search in the absence of any guidance by Tennessee administrative or statutory law [Doc. 96, p. 4]. Defendant asserts that his contention, rather, is that the presence or absence of consent and reasonable suspicion at the time of the execution of a true parole search are a *factors* that must be *considered* when evaluating the totality of the circumstances [*Id.*]. Accordingly, defendant objects to the R&R's determination "that the consideration of the presence or absence of consent or reasonable suspicion in true parole searches is not a factor when determining the totality of the circumstances" [*Id.*].

In support of this argument, defendant provides that the Tennessee General Assembly has not enacted legislation to provide procedural safeguards for parolees, but the

8

Tennessee Supreme Court in *State v. Stanfield*, 554 S.W.3d 1 (Tenn. 2018) appears to conclude that a parole search is not reasonable if conducted out of personal animosity [*Id.* at 3]. Thus, defendant avers, it appears that the Tennessee Board of Probation and Parole, and those conducting parole searches, essentially have unlimited discretion so long as there is no personal animosity by the searching officer towards the parolee [*Id.* at 3–4]. Accordingly, defendant submits that "[g]iven this broad legislative grant of authority to the Tennessee Board of Probation and Parole (and then further to law enforcement), the presence or absence of consent [and reasonable suspicion] at the time an asserted parole search is to be performed is a factor a court must consider when determining whether a true parole search is reasonable under the Fourth Amendment" [*Id.* at 4]. And here, defendant asserts that neither he nor Ms. Netherland consented to the search [*Id.*].

In response, the government avers that the R&R correctly concluded that defendant consented to a search of his residence by law enforcement when he signed his parole certificate containing a search condition [Doc. 97, p. 3].

First, the Court does not find that the R&R mischaracterized or misrepresented defendant's arguments as to consent and reasonable suspicion. In his supplement to his motion to suppress, defendant recites Rule 1100-01-01-.06(6) of the Rules of the Tennessee Board of Parole ("the Board"), which provides:

> In granting parole, the Board may impose any conditions and limitations and that the Board deems necessary, including consent by the offender to submit to search by TDOC staff or law enforcement. Pre-release conditions may be mandated in accordance with treatment recommendations of the Department of Correction based on validated risk and needs assessment.

9

[Doc. 63, pp. 2–3 (citation omitted)]. Defendant then submits that based on the above parole regulation, "consent is required" [*Id.* at 3]. Defendant does admit that he signed a parole certificate which did, in part, state that defendant agreed to a "search, without a warrant of [his] person, vehicle, property, or place of residence, by any Probation/Parole officer or law enforcement officer, at any time without reasonable suspicion" [Doc. 50-1]. However, defendant argues, it is unclear whether the Board's regulation requires "additional and further consent at the time of the proposed search[,]" and thus, defendant's position is that "additional consent at the time of the proposed search *is required*" [Doc. 63, p. 4 (emphasis added)]. Based on these statements, the Court does not find that the R&R misrepresented defendant's argument as to consent.

> Regarding reasonable suspicion, defendant contends in his supplement that:
>
> Tennessee's absence of judicial or statutory safeguards should result with the establishment of a minimum safeguard of at least reasonable suspicion when determining the constitutionality of a warrantless search of a parolee under the totality of circumstances test.

[*Id.* at 6 (citing *United States v. Herndon*, 501 F.3d 683, 689 (6th Cir. 2007) ("Our court has generally rested a search condition's validity by confirming the presence of a reasonable suspicion requirement and its consistency with the federal reasonable suspicion standard."))]. Based on his own statement, and the attached citation, it is apparent that defendant's position is for a mandatory minimum safeguard when it comes to warrantless searches of parolees, and that is, reasonable suspicion. Therefore, the Court does not find that the R&R misrepresented defendant's argument as to reasonable suspicion.

10

Regardless, though, of how the R&R described defendant's arguments, defendant's remaining objection here is unfounded. Specifically, defendant asserts that the R&R concluded that "the consideration of the presence or absence of consent or reasonable suspicion in true parole searches is not a factor when determining the totality of the circumstances" [Doc. 96, p. 4]. The R&R, however, is devoid of this conclusion, and defendant fails to cite to where any such conclusion may be. Nevertheless, for clarity, the Court will address defendant's objection.

A parole search "may be deemed reasonable by examining the 'totality of the circumstances.'" *United States v. Sharp*, 40 F.4th 749, 753 (6th Cir. 2022) (quoting *Samson v. California*, 547 U.S. 843, 848 (2006)). Relevant factors under the totality-of-the-circumstances approach include: "(1) a person's position on the 'continuum' of criminal punishments"; "(2) the terms of the search condition communicated to the person"; and "(3) the State's interest in supervision." *Id.* (citations omitted). As noted by the Sixth Circuit in *Sharp*, the Supreme Court in *Samson* considered the following factors in its totality-of-the-circumstances analysis:

> that parole is more akin to imprisonment than probation, the extent and reach of California's general parole conditions, the plain terms of [Samson's] parole search condition, which expressly authorized suspicionless searches, the fact that Samson's parole condition was clearly expressed to him, California's substantial interest in supervising a vast population of parolees with a high recidivism rate, and California's requirement that parolee searches not be arbitrary, capricious, or harassing.

*Id.* at 754–55 (internal citations and quotation marks omitted). After balancing these factors, the Supreme Court in *Samson* concluded that the suspicionless search of the

11

defendant was reasonable under the circumstances. *Id.* at 655 (citing *Samson*, 547 U.S. at 852).

Turning first to consent, the R&R does in fact acknowledge and consider defendant's consent by referring to the parole certificate signed by defendant and its terms [*See* Doc. 90, p. 34 ("A parole search, however, is based on [d]efendant's consent to a condition permitting such search based on his status as a parolee.")].[3]  *See Sharp*, 547 U.S. 40 F.4th at 753 (noting that "the terms of the search condition communicated to the person" is a relevant factor to be considered in the totality-of-the-circumstances analysis). Similarly, in *United States v. Brown*, the Sixth Circuit stated that the defendant, Brown, "agreed to specific search conditions as set forth by the terms of his parole" and "signed and agreed to these terms to obtain parole."  832 F. App'x 397, 400–01 (6th Cir. 2020).  As stated previously, however, defendant here argues that there should be a consideration of further consent, specifically at the time of the parole search [*See* Doc. 63, p. 4].  Yet, defendant provides no case law in his initial supplement to support this argument, nor does he provide any now [See Doc. 96, p. 4].  Moreover, and as already noted by the R&R [*see* Doc. 90, p. 34], defendant's position would run contrary to the search condition in his parole certificate, which allows for a search "at any time[,] [Doc. 50-1] and would, therefore, include instances in which defendant is not present at his residence.

---

[3]  The Court also notes that the parole certificate cited by the R&R provides that defendant "fully understand[s] th[e] order of parole" and that he "agree[s] to comply" with the conditions set forth by the parole certificate during his period of parole [*See* Doc. 50-1].

Moving to reasonable suspicion, the R&R explicitly notes that the plain terms of defendant's parole search condition permit a search "without reasonable suspicion" [Doc. 90, pp. 4, 29; *see* Doc. 50-1]. And in consideration of this term, the R&R discusses, and relies upon, authority that involves similar parole search conditions [*See* Doc. 90, pp. 29, 31–34]. *See Sharp*, 40 F.4th at 758 (concluding that *Samson* "plainly instructs . . . to factor a parolee's search conditions into the reasonableness balance"). *See generally Samson*, 547 U.S. at 855 (dismissing the petitioner's observation that other states and the federal government "have been able to further similar interests in reducing recidivism and promoting recidivism, despite having systems that permit parolee searches based upon some level of suspicion" because of its little relevance in determining whether California's supervisory system, which allows for suspicionless searches, "is drawn to meets its needs and is reasonable, taking into account a parolee's substantially diminished expectation of privacy").

The Court also acknowledges that some courts, while recognizing that a defendant's parole condition allows for a suspicionless search, nonetheless consider reasonable suspicion. *See United States v. Mills*, No. 3:20-CR-94, 2021 WL 6101534, at *16 (E.D. Tenn. Oct. 8, 2021), *report and recommendation* adopted, No. 3:20-CR-94, 2021 WL 5205623 (E.D. Tenn. Nov. 9, 2021) (finding that, while reasonable suspicion is not required, law enforcement had reasonable suspicion that the defendant was engaged in drug trafficking). And here, the R&R explicitly concluded that the officers in this case did not just have reasonable suspicion but "had *probable cause* to believe that [d]efendant, a parolee, stole a firearm based on an indictment and warrant for his arrest" [Doc. 90, p. 37].

13

*See Alabama v. White*, 496 U.S. 325, 330 (1990) (providing that "[r]easonable suspicion is a less demanding standard than probable cause").  Thus, it appears to the Court that the R&R did consider reasonable suspicion in its totality-of-the-circumstances analysis as the Sixth Circuit did in *Brown*.  *See* 832 F. App'x at 401 (concluding that law enforcement officers had two reasons to search the defendant: "the terms and conditions of his parole *and* his status as a person of interest in a homicide investigation"); *see also Mills*, 2021 WL 6101534, at *16.

Accordingly, for the reasons discussed above, defendant's objections here are **OVERRULED**.

### 2.    Thorough Nature of Search

Next, defendant objects to the R&R's conclusion that it cannot consider the thorough nature of the search under the totality of the circumstances simply because defendant "both signed the parole certificate . . . and he violated his parole because a parole condition was that he could not own, possess, or carry a firearm despite there being no parole violation warrant issued prior to his arrest" [Doc. 96, p. 5 (internal quotation marks omitted) (quoting Doc. 90, pp. 34–37)].  Defendant, as with his previous objection, also alleges that the R&R mischaracterizes his argument regarding the nature and extent of the search in this case by minimizing the "breadth and depth" of the search, which "is a factor the Court is *required* to consider under the totality of the circumstances" [*Id.* (emphasis added)].  Defendant contends that his true argument is that the search was unreasonable in its thoroughness as it "extended to every room of the house including kids' rooms, storage

14

rooms, women's purses, dresser drawers filled with women's clothing, the attic and the search for cash; all at the request of a Lieutenant of the Organized Crime Unit" [*Id.*].

Expanding on this contention, defendant submits that the extensive search by law enforcement was arbitrary and capricious in light of the officers' search for a *large* firearm [*Id.* at 7]. Specifically, defendant submits that the sought-after firearm could not have been found in the small backpack, the bathroom toolbox, or the safe the officers searched. Therefore, defendant avers, law enforcement's decision to search in areas and compartments where the firearm could not be found "demonstrates that this search was not a parole search but, instead, an unlawful, investigative search of the whole house" [*Id.*]. Thus, to the extent the R&R omits places where the firearm could not be located, defendant objects [*Id.*].

Defendant also submits that the search was unreasonable because law enforcement did not determine the space over which defendant had "common authority," asserting that a parole search is limited to the parts of the premises to which a parolee has common authority when multiple people share a residence [*Id.* at 5]. In support of this contention, defendant submits that Ms. Netherland stated that the right front bedroom was hers, and defendant did not provide an answer as to which room was his [*Id.* at 5–6]. Therefore, defendant asserts, "no officer confirmed which bedroom [defendant] occupied and Ms. Netherland asserted that the right front bedroom where the firearms and drugs were found" was hers [*Id.* at 6]. Defendant further notes that Officer Johnson told Officer Jordan that defendant came from the back right bedroom, but Officer Jordan's later affidavit for a

15

search of the safe stated that defendant was seen exiting from the right front bedroom [*Id.* at 7 (citations omitted)].

First, despite defendant's contention, the R&R does not contain the conclusion that "it cannot consider" the thorough nature of the search under the totality-of-the-circumstances analysis. And to the contrary, it appears that the R&R considers defendant's thoroughness argument in light of the conditions of his parole, one of which prohibits defendant from owning, possessing, or carrying a firearm [*See* Doc. 90, p. 35 (citing Ex. 27, p. 1)]. Second, to the extent defendant contends that the R&R "mischaracterizes" his argument, the Court disagrees. In his motion to suppress, defendant stated twice that the officers in this case performed an "intensive" search and characterized the search as a "parole compliance check" [Doc. 42, pp. 2, 5]. Later in the same motion, defendant submitted simply that the "completeness of the search" is another factor to be considered in the totality-of-the-circumstances analysis [Doc. 42, p. 6]. At the suppression hearing, defense counsel similarly made note of the "exhaustive search of all the rooms, including an attic" [Doc. 92, p. 137]. With these arguments, the R&R characterized defendant's position as follows: "[Defendant] contends the thorough nature of the search which extended to the attic and included searching inside cabinets and under the bed shows the search was not a true parole search" [Doc. 90, p. 34 (citing Doc. 42, p. 6)]. Ultimately, the Court finds that the R&R's characterization of defendant's argument aligns with what he submitted in his motion and at the hearing.

Moreover, the Court finds that, to the extent it could be said that the R&R "mischaracterizes" defendant's arguments, it is because defendant failed to meaningfully develop his "thoroughness" and "breadth and depth" arguments until now. *See generally McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citing *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995))). Nevertheless, defendant's objection is meritless because he attempts to frame the parole search as being bound to the object law enforcement had, at the least, reasonable suspicion to believe defendant stole. However, this approach does not align with defendant's parole search condition, in which defendant's residence or property may be searched without reasonable suspicion [*See* Doc. 50-1]. In other words, given law enforcement would not need reasonable suspicion in the first instance to conduct a search of defendant's residence or property, it does not follow that having reasonable suspicion would limit law enforcement from engaging in a broader search for contraband when conducting a parole compliance check.[4]

Additionally, while defendant asserts that the "breadth and depth" of the search is a "required" factor of consideration under the totality-of-the-circumstances analysis, defendant cites to no legal authority in support of this proposition.

---

[4] The Court also notes that defendant's contention here cuts against his other argument that the search was merely a "subterfuge" to allow officers to search for the alleged stolen firearm without a warrant [*See* Doc. 90, p. 30 (citing Doc. 42, pp. 5–6)]. Specifically, if law enforcement was only using the parole search condition as a means to uncover the alleged stolen firearm, it does not follow that law enforcement would continue its search once such firearm was found.

17

As to his objection regarding "common authority," the Court begins by observing that although it "must engage anew with issues raised after the magistrate judge's Report and Recommendation, the Sixth Circuit has generally articulated that 'issues raised for [the] first time in objections to [a] magistrate judge's report and recommendation are deemed waived.'" *Morgan v. Trierweiler*, 67 F.4th 362, 367 (6th Cir. 2023) (first citing *Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000); and then citing *United States v. Waters*, 158 F.3d 933, 936 (6th Cir. 1998)); *accord United States v. Burney*, No. 2:23-CR-79, 2024 WL 987877, at *3 (E.D. Tenn. Mar. 7, 2024), *aff'd*, No. 24-5613, 2025 WL 1896442 (6th Cir. July 9, 2025) (concluding that the defendant's objection was waived because he did not raise the argument in his motion to suppress). Upon review of the record, specifically defendant's motions and the suppression hearing transcript, the Court finds that defendant's argument here was not presented to the Magistrate Judge and is therefore, waived. While defendant does make reference to the room law enforcement saw him exit from within the residence, this argument pertains to his *Franks* request [*see* Doc. 63, p. 12], not the totality-of-the-circumstances analysis under which the search of the residence is analyzed.

Accordingly, for all the reasons set forth above, defendant's objections here are **OVERRULED**.

### 3. Parole Officer's Presence, Involvement, and Knowledge

Next, defendant appears to make three overall objections regarding the R&R's discussion of his parole officer's involvement in the search of the residence. First, defendant objects to the R&R's "declination to consider the fact of whether the parole

18

officer has knowledge of, is present during, or absent from an asserted parole search when considering the totality of the circumstances" [Doc. 96, p. 8]. As to this objection, defendant appears to submit that the R&R only notes the parole officer's involvement in the search, as well as physical presence at the search, in relation to defendant's "reverse stalking horse" argument [*Id.*]. Defendant appears to contend that, notwithstanding his "reverse stalking horse" argument, the parole officer's involvement in the search, her physical presence at the search, as well as her knowledge of the search should all be considered as factors in the totality-of-the-circumstances analysis of reasonableness [*Id.*].

Second, and moving to his actual "reverse stalking horse" argument, defendant objects to the R&R's conclusion "that the 'stalking horse caveat' is not a factor the Court can consider when determining the reasonableness of the search in this case while addressing the totality of circumstances" [*Id.*]. Specifically, instead of considering his "reverse stalking argument," defendant argues that the R&R simply relies on *Brown* to conclude that a search "is reasonable if conducted pursuant to a search condition allowing suspicionless searches if the totality of circumstances supports this conclusion" [*Id.* at 9 (citing 832 F. App'x at 400)]. To this point, defendant contends that the R&R merely deduces that defendant's signed parole certificate did not require the presence of his parole officer at the search, and that the principles related to "reverse stalking horse" do not apply [*Id.*].

Lastly, defendant objects to the R&R's determination that the facts in this case indicate that defendant's parole officer was involved in the search [*Id.* at 9–10].

19

In response, the government reiterates that, under Sixth Circuit case law, "the stalking horse caveat does not apply to a parolee subject to a search condition when the search is reasonable under the totality of the circumstances because parolees have a lesser expectation of privacy than probationers" [Doc. 97, p. 2 (first quoting Doc. 90, p. 32 n.7; and then citing *United States v. Ickes*, 922 F.3d 708, 712 (6th Cir. 2019))]. Additionally, the government contests defendant's claim that his parole officer had no knowledge that the search at issue was to take place, and his consequential conclusion that therefore, "the search cannot be a true parole search" [*Id.* (citing Doc. 96, p. 8)].

The Court begins with defendant's contention that the R&R did not consider his parole officer's role in the search at issue outside the context of this "reverse stalking horse" argument. In his motion to suppress [Doc. 42] and during the suppression hearing [Doc. 92], defendant made two brief arguments related to the role of his parole officer outside of his "reverse stalking horse" contention. First, in his motion, defendant submitted that "other factors to be considered include . . . the status of the parole officer's knowledge, or lack of knowledge, of the search" [Doc. 42, p. 6]. Then, during the suppression hearing, defendant stated that, in examining the totality of the circumstances, the Court should consider that defendant's parole officer was not present [Doc. 92, p. 111].

Beginning with the parole officer's knowledge, the Court foremost notes that, aside from the R&R's analysis, defendant provides no legal support for his assertion that a parole officer's knowledge should be considered in the totality-of-the-circumstances doctrine elucidated in *Samson* [*See* Doc. 42, p. 6]. Moreover, a parole officer's knowledge is not listed as a "relevant factor" under the *Samson* doctrine; rather, the relevant factors "include

20

the suspect's post-supervision status, terms of the search condition, and the State's interest in post-release supervision." *United States v. Dunbar*, No. 22-3087, 2022 WL 17245098, at *3 (6th Cir. Nov. 28, 2022) (citing *Sharp*, 40 F.4th at 753). And, as discussed more so *infra*, defendant's search condition allowed for a search by "*any* Probation/Parole officer *or* law enforcement officer, *at any time*" [Doc. 50-1 (emphasis added)]. These terms reveal to the Court two points as to defendant's contention that his parole officer's knowledge should be considered in the totality of the circumstances. First, defendant's search condition is not restricted to defendant's own parole officer. Rather, the search condition is expansive as to who may conduct the search, allowing for *any* probation/parole officer and even a law enforcement officer to conduct a search without a warrant and without reasonable suspicion [*Cf.* Doc. 50-1 (showing other terms of defendant's parole certificate wherein "Probation/Parole Officer" is preceded by the qualifier "my")]. The broader category of individuals authorized to perform a search of defendant or his residence cuts against defendant's argument that the R&R should have considered his parole officer's knowledge in the totality of the circumstances, not just in the context of his "reverse stalking horse" argument. Second, the phrase "at any time" suggests to the Court that parole searches could be spontaneous and involve little preplanning. Again, this cuts against defendant's argument that the knowledge of his parole officer of the search conducted should be considered in the totality-of-the-circumstances analysis.[5]

---

[5] The Court also notes that, even if the R&R did consider the parole officer's knowledge of the search in the totality of the circumstances, this would not lend to a finding that the search was unreasonable because the R&R concluded that "the testimony shows that Defendant's parole

Next, as to consideration of the parole officer's presence, the Court reiterates that the totality-of-the-circumstances doctrine laid out in *Samson* includes the relevant factor of the "terms of the search condition" communicated to the defendant. *Sharp*, 40 F.4th at 753. Here, the search condition communicated to defendant explicitly stated that a probation/parole officer *or* a law enforcement officer could conduct a search of defendant's person, vehicle, property, or place of residence at any time without a warrant or reasonable suspicion [*See* Doc. 50-1]. And the R&R considered this fact, emphasizing that the "terms to which [d]efendant agreed do not require the parole officer to be present during a parole search" [Doc. 90, p. 36 (citation omitted)]. While the R&R may have included this conclusion within its analysis of defendant's "reverse stalking horse" argument, the conclusion nonetheless supports a finding that the search at issue was reasonable under the totality-of-the-circumstances analysis.

The Court turns next to defendant's second sub-objection, which focuses on his "reverse stalking horse" argument. "The prohibition on law-enforcement officers' using parole officers as 'stalking horses' for their own investigations stems from a line of cases starting" with *Griffin v. Wisconsin*, 483 U.S. 868 (1987). *United States v. Sweeney*, 891 F.3d 232, 236 (6th Cir. 2018). The Supreme Court in *Griffin* "justified warrantless searches of probationers based on the 'special needs' of a state in administrating its system of probation." *Id.* (citing *Griffin*, 483 U.S. at 873–77). And as the Sixth Circuit has explained,

> Because the exception to the warrant requirement is predicated on the special needs inherent in a system of probation, the search must be related to those

officer knew about and was involved in the preparations for the parole search." Though, as noted *supra* and discussed *infra*, defendant contests this finding.

22

> needs and not merely an instant of law-enforcement officers' using a parole officer as a stalking horse to assist in an unrelated investigation.

*Id.* (citation omitted). However, in the more recent decision of *Samson*, the Supreme Court grounded the exception to the warrant requirement "in the lower expectation of privacy enjoyed by probationers, which is weighed against the promotion of legitimate governmental interests to determine whether the search was reasonable under 'the totality of the circumstances.'" *Id.* (citing *Samson*, 547 U.S. 849–52). Given that this justification for the exception to the warrant requirement "is not always related to the special needs of the probationary system, the reason for conducting the search need not necessarily be related to those needs either." *Id.* Accordingly, the Sixth Circuit in *Sweeney* concluded that when the "totality-of-the-circumstances doctrine as articulated in *Samson*" is relied upon, rather than the "special needs" doctrine," the stalking-horse exception does not apply.[6] *Id.*

Taking this precedent into consideration, the Court finds that the R&R was correct in concluding that the stalking horse caveat does not apply to a parolee who is subject to a search condition "if the totality of the circumstances show the search to be reasonable" [Doc. 90, p. 35 (citations omitted)]. And while defendant here submits that the search of his residence was a "reverse stalking horse" scenario because "the parole officer was not present for the search, nor did she authorize the search" [Doc. 90, p. 35 n.8 (citing Doc. 63,

---

[6] While the Supreme Court decisions discussed by *Sweeney* dealt with probationers, the *Sweeney* decision itself dealt with parolees. *See id.* at 237 ("In short, the stalking-horse exception to the general rule allowing parole officers to search a parolee's residence does not apply when, as here, that search is reasonable under the totality of the circumstances, as authorized by *Samson*.").

p. 7)], defendant provides no support for how this argument would survive if the traditional "stalking horse" exception does not apply here. Additionally, while defendant argues that his "reverse stalking horse" argument was deduced to the terms of his parole, which he signed off on, defendant sets forth no argument that such terms were invalid. Lastly, to the extent defendant argues that the R&R did not consider his "reverse stalking horse" argument in its analysis of the totality-of-the-circumstances, such argument misunderstands the above case law. Specifically, the "stalking horse" exception is not subsumed by the totality-of-the-circumstances doctrine, and this is evidenced by the exception's inapplicability when a "search is reasonable under the totality of the circumstances." *Sweeney*, 891 F.3d at 237.

Finally, defendant disagrees with the Magistrate Judge's factual determination that defendant's parole officer was involved in the parole search [Doc. 96, pp. 9–10 (citing Doc. 90, p. 36)]. In more detailed fashion, defendant argues that (1) Officer Jordan did not receive a request to conduct a search from PO McCord; (2) Officer Jordan did not have PO McCord's phone number saved in his phone; (3) Officer Jordan did not communicate with PO McCord during the search; and (4) Officer Jordan did not have any direct contact with PO McCord [*Id.*]. At the outset, the Court finds that defendant's objection here is merely a repackaging of his prior arguments [*See* Doc. 42, p. 3 ("The parole officer was not present during the search and there were indications that the parole officer was not aware that a search was to occur."); Doc. 63, p. 7 ("[Defendant's] parole officer was not present at the search. [Defendant's] parole officer did not participate in the search. There is no proof that his parole officer authorized the search."); Doc. 92, p. 111 ("Ms. McCord was not

24

present. Ms. McCord's number does not appear to be in Officer Jordan's phone as one would expect if someone is out doing parole and probation searches."); *id.* at 94–95 (Testimony of Officer Jordan) ("Q. You didn't get in touch with [PO McCord] that evening, did you? . . . A. Not at this particular moment. It doesn't appear that she answered."). The Court reiterates that it is under no obligation to review *de novo* objections that are merely an attempt to have the Court reexamine the same arguments set forth in briefs and evidentiary hearings. *Dawson*, 2020 WL 109137, at *1.

Nevertheless, the Court will briefly address each of defendant's factual contentions.[7] As to defendant's first point, that is, that PO McCord did not request Officer Jordan to conduct a parole search, the Court finds that the R&R is devoid of this factual finding. Rather, the R&R states that the CERT squad was assigned to conduct the parole search of defendant [Doc. 90, p. 4; *see id.* at 36 (stating that an officer from the CERT unit "talked with PO McCord about conducting a parole search")]. Thus, the R&R is not in dispute with defendant's factual account in this regard. The Court finds similarly for defendant's second argument. In particular, the R&R explicitly states that, "Officer Jordan said he did not have PO McCord's phone number preprogramed into his phone" [*Id.* at 22]. Thus, the Court does not find there to be any discordance here. The Court would also note that, during Officer Jordan's testimony at the suppression hearing, he testified that he likely had PO McCord's phone number in his "old work phone" and that, during the search, he attempted to call PO McCord on a phone that was *not* his work phone [*See* Doc. 92, pp.

---

[7] The Court also notes that defendant makes no argument as to how his version of the facts would lend itself to a different legal conclusion.

69, 93–94]. Moreover, Officer Jordan explained that he usually contacts Tommy Cox, PO McCord's supervisor, when doing parole compliance checks, which defendant does not appear to dispute [*Id.* at 94].

Officer Jordan's statement that he usually contacts Supervisor Cox when doing parole compliance checks also cuts defendant' third argument, that is, that Officer Jordan did not communicate with PO McCord during the search. Specifically, Officer Jordan's comment indicates that, during a parole search, communication may occur with upper-level supervisors who manage lower-level parole officers rather than the parole officers themselves.[8] Additionally, the facts of this case indicate that Officer Jordan *did* attempt to contact PO McCord, but PO McCord did not answer [Doc. 92, pp. 94–95]. And to this point, Officer Jordan stated during the suppression hearing that his understanding was that PO McCord had planned to join the parole compliance check, "but she fell ill and was unable to make it that evening" [*Id.* at 40–41]. Given Officer Jordan's knowledge that PO McCord was feeling ill at the time of the search, it follows that he may not have, or may not have been able to, communicate with her during the actual performance of the search.

Finally, the Court turns to defendant's final argument that Officer Jordan did not have direct contact with PO McCord. As set out by the R&R, it appears that the only direct contact between PO McCord and Officer Jordan as to defendant here is when PO McCord sent defendant's signed parole compliance rules to Officer Jordan via email [Doc. 90, pp.

---

[8] The Court also notes that Officer Jordan testified that he agreed to maintain contact with Lieutenant Josh Schaeffer during the search because Lieutenant Schaeffer was who he had received the assignment from to go to defendant's residence [*See* Doc. 90, p. 12].

13–14]. Officer Jordan, however, was not the only law enforcement officer involved in the parole compliance check of defendant. Rather, other members of the CERT squad were involved in the search [*id.* at 25], and defendant does not object to, for example, the R&R's statement that another officer from the CERT unit "talked with PO McCord about conducting a parole search and confirmed [d]efendant's address and that the search condition was a condition of his parole" [*Id.* at 36]. Relatedly, defendant does not explain why Officer Jordan's contact with PO McCord is the only contact that would matter in his case, especially when five other officers, including one of higher rank, were also involved in the search [*Id.* at 12].

Ultimately, while the facts highlighted by defendant may go the *extent* of PO McCord's involvement with the search, the Court does not find that the Magistrate Judge erred in concluding that defendant's parole officer had *some* level of involvement in the search. Accordingly, for the reasons set forth above, defendant's objections here are **OVERRULED**.

### 4. Arbitrary, Capricious, or Harassing and Personal Animosity

Next, defendant objects to the R&R's "conclusion that Officer Jordan's purported parole search was not arbitrary, capricious, or harassing because it was not motivated, in whole or in part, by Officer Jordan's personal animosity toward [defendant]" [Doc. 96, p. 10]. Defendant argues that, as opposed to the R&R's determination, the totality of the circumstances support "a finding of arbitrary, capricious, or harassing" and "a finding of a search being performed out of personal animosity by Officer Jordan toward [defendant]" [*Id.* at 11]. In support of his objection, defendant submits that Officer Jordan "volunteered

27

to engage [defendant] the night of January 20, 2023, because of an earlier incident where Officer Jordan charged [defendant] with evading arrest that was later dismissed" [*Id.* at 11]. Further, defendant contends that Officer Jordan could have done defendant's parole compliance check on January 26, 2023, but that Officer Jordan "elected to do it earlier because of his prior involvement with [defendant]" [*Id.*].

In response, the government asserts that the Magistrate Judge was correct in concluding that the evidence did not support of finding that Officer Jordan conducted the parole compliance check to harass defendant for a prior incident [Doc. 97, p. 4]. Ultimately, the government avers, Officer Jordan was not the decision-maker here [*Id.*]. Rather, the CERT squad, of which Officer Jordan was a member, "was assigned to execute the arrest warrant and conduct the parole search by another unit" [*Id.* (quoting Doc. 90, pp. 36–37)].

As to defendant's submission that Officer Jordan volunteered to engage with defendant due to a prior incident, this is merely a reiteration of an argument made to the Magistrate Judge [*See* Doc. 63-4, pp. 2–3 (affidavit by defendant) (stating that Officer Jordan "indicated that he volunteered to arrest [defendant] regarding the alleged theft of the firearm"); Doc. 90, p. 37 n.9 (noting that, at the evidentiary hearing, defense counsel argued "that the body camera videos show that Officer Jordan said he volunteered to execute the arrest warrant")]. Again, the Court is under no obligation to review objections that are merely reiterations of arguments already presented to and reviewed by the Magistrate Judge. *See Dawson*, 2020 WL 109137, at *1. Moreover, even if Officer Jordan did "volunteer[ ] to engage" with defendant the night of January 20, 2023, defendant fails

28

to explain how volunteering to execute a pre-existing arrest warrant, in conjunction with being assigned to perform a parole compliance check on defendant, would support a finding that the search was arbitrary, capricious, harassing, or performed out of personal animosity.

Defendant's second contention fails as well. As noted previously, defendant argues that Officer Jordan could have conducted defendant's parole compliance check at a later date, but that Officer Jordan "elected" to do it earlier because of his prior involvement with defendant [Doc. 96, p. 11]. Foremost, defendant's assertion is merely speculation of Officer Jordan's mindset, and he fails to cite any evidence that indicates a decision by Officer Jordan to conduct the parole compliance check "earlier" than needed. Second, defendant provides no explanation as to why the timing of the parole compliance check, specifically a six-day-difference, causes the check to be arbitrary, capricious, harassing, or performed out of personal animosity. Regardless, and as defendant admits, the parole compliance check was set to occur at some point.

Accordingly, for all the reasons set forth above, defendant's objection here is **OVERRULED**.[9]

### 5. Arrest and Removal from Residence

Next, defendant objects to the R&R's "declination to consider the fact that he was already arrested for the outstanding criminal warrant and removed from the residence under

---

[9] The Court also notes that the language "arbitrary, capricious, or harassing" derives from *Samson*, in which the Supreme Court was discussing "*California's* prohibition on 'arbitrary, capricious or harassing' searches." 547 U.S. at 856 (emphasis added) (citations omitted).

the totality of the circumstances" [Doc. 96, p. 11]. At the same time, however, defendant also argues that the R&R mischaracterized his argument by stating that his unreasonableness argument was partially predicated on the fact that the officers had already arrested and detained defendant at the time of the search [*Id.* at 11–12]. Defendant appears to assert that his argument instead goes back to consent [*Id.* at 12]. Specifically, defendant submits that, "[u]nder the totality of the circumstances, the search was unreasonable because officers failed to give notice prior to unlawfully entering the residence[,]" and "no person consented to law enforcement entering the residence" [*Id.*].

In response, the government submits that the Magistrate Judge correctly concluded that defendant gave consent to the search when he signed his parole certificate [Doc. 97, p. 3].

Foremost, the Court notes that defendant appears to offer conflicting points, as he objects to the R&R's declination to consider his arrest and removal from the residence while also stating that what the R&R failed to consider is not his argument [Doc. 96, pp. 11–12]. Setting this aside, the Court does not find that the R&R mischaracterized defendant's argument. In his motion to suppress, defendant argues that one of the other factors to be considered in the totality of the circumstances is "the fact that [defendant] was [ ] completely in custody in the back of a police cruiser when the search occurred" [Doc. 42, p. 6]. Thus, the R&R's summarization does not misrepresent defendant's argument. Regardless, defendant appears to abandon this argument and return to his earlier argument regarding consent. Accordingly, the Court reincorporates here its earlier analysis of consent in Section III.A.1. Furthermore, the Court reiterates that necessitating prior notice

30

by law enforcement or consent at the time of the search would conflict with the search condition in defendant's parole certificate, which again allows for a search "at any time" [Doc. 50-1].

### 6. Reliance on *Brown*

Finally, defendant submits that the R&R's reliance on *Brown* is misplaced, as his case is factually distinct from that of *Brown* [*Id.* at 12]. In particular, in *Brown*, law enforcement contacted the defendant's parole officer to inform him that the defendant was a person of interest in a homicide investigation [*Id.* (citing 832 F. App'x at 397–98)]. After the defendant's parole officer attempted to schedule a compliance check with the defendant, the defendant appeared at the parole office unannounced [*Id.* (citing 832 F. App'x at 398)]. At that point, the defendant's parole officer contacted his superior with the Tennessee Department of Corrections, and his superior conducted a search of the defendant's vehicle pursuant to the search condition of the defendant's release on parole [*Id.* at 12–13 (citing 832 F. App'x at 398)]. During the search, the superior saw an extended magazine of a gun protruding from underneath the driver's seat at which point the superior stopped the search, closed the door, and alerted law enforcement to take over the investigation [*Id.* (citing 832 F. App'x at 398)]. After arriving on scene, law enforcement obtained a search warrant before proceeding further [*Id.* (citing 832 F. App'x at 398)].

In contrast, defendant submits that the record here is devoid of any evidence that his parole officer "was made aware of [defendant's] outstanding process for the alleged theft" [*Id.*]. Moreover, there were no compliance checks scheduled with defendant here nor did defendant's parole officer conduct the parole search in this case [*Id.*]. Rather, law

31

enforcement initiated the search in this case and did not obtain a search warrant after finding the first items of contraband [*Id.*].

To start, the Court notes that objections to an R&R must be specific, and a specific objection "explain[s] and cite[s] specific portions of the report which [counsel] deem[s] problematic." *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) (citation omitted); *accord United States v. Lang*, 652 F. Supp. 3d 820, 828 (E.D. Ky. 2023); Fed. R. Crim. P. 59(b)(2). Defendant fails to meet these requirements of specificity and identification. First, defendant's objection is general. The R&R cites to *Brown* throughout its analysis of the search at issue here, and it cites to *Brown* for a variety of propositions [*See* Doc. 90, pp. 29, 32–33, 35–36]. Thus, objecting to the R&R's reliance on *Brown* provides the Court with no clarity as to what defendant's contention actually is. Second, and to this same point, defendant cites to nearly the entirety of the R&R's discussion of the residential search in this case when making his objection [*See* Doc. 96, p. 12 (citing Doc. 90, pp. 29–36)]. Thus again, defendant fails to pinpoint where he disagrees with the R&R's reliance on *Brown*. Relatedly, the Court also notes that defendant provides no explanation as to why the factual distinctions in *Brown* would lead to a different legal conclusion in his case.

Nevertheless, the Court, in reviewing the likely portions of the R&R to which defendant protests, finds that defendant's objection here is meritless.[10] First, the R&R

---

[10] As defendant's factual distinction argument appears to relate primarily to his parole officer's role in the search, the Court also incorporates its earlier discussion of such here. *See supra* Section III.A.3.

relied on *Brown* in finding that the "Sixth Circuit [has] approved suspicionless parole searches[,] . . . wh[en] deal[ing] with the same Tennessee parole condition here" [Doc. 90, p. 33].  However, as discussed above, the R&R found there to be probable cause in this case, which is an even more demanding standard than reasonable suspicion.  *See supra* Section III.A.1 (citing *White*, 496 U.S. at 330).  Additionally, the R&R's proposition is not only supported by the *Brown* but also two Tennessee Supreme Court cases: *United States v. Hamm*, 589 S.W.3d 765, 777 (Tenn. 2019) and *State v. Stanfield*, 554 S.W.3d 1, 11 (Tenn. 2018).

The R&R also relied on *Brown* in finding that the Sixth Circuit "has expressly rejected application of the stalking horse caveat to a parolee, who is subject to a search condition if the totality of the circumstances show the search to be reasonable" [Doc. 90, p. 35].  This proposition has already been discussed at length by the Court, *see supra* Section III.A.3, and the Court sees no reason to revisit such issue here.

Accordingly, defendant's objection to the R&R's reliance on *Brown* is **OVERRULED**.

### B.    Search of the Safe

The Court now moves to the search of the safe seized from 2309 Dodson Avenue.  First, defendant objects "to the absence of findings of facts and conclusions of law as it relates to his assertions that Officer Jordan opened the safe after he seized and removed it . . . and before first obtaining the search warrant" [Doc. 96, p. 13].  Second, defendant objects to the extent the R&R concludes that "the safe was not opened until after the search warrant was obtained" [*Id.*].

33

To these points, defendant states that Officer Jordan seized and removed the safe at issue on January 20, 2023, and he prepared Property Inventory Report ("PIR") the same day [*Id.* at 14]. Defendant submits that the PIR bears a handwritten time stamp of 18:35, and within this PIR, Officer Jordan made a handwritten itemized list [*Id.*]. This list, however, consists only of items that were located in the locked safe, starting with a Ruger LC9 firearm [*Id.*]. And the search warrant for the safe was not issued until January 21, 2023 [*Id.*]. Accordingly, defendant argues that the PIR cannot be a "continuation" of the PIR from January 20, 2023, as the R&R concludes, because the PIR does not contain any of the items seized on January 20, 2023 [*Id.*]. In other words, "[t]his is not a situation where Officer Jordan started the handwritten list on January 20, 2023, and then added to it on January 21, 2023" [*Id.*]. Rather, Officer Jordan made the list of the safe's contents before applying for and receiving a warrant for such safe [*Id.*].

In further support of his timing argument, defendant states that "all the times used by Officer Jordan were in military time" [*Id.* at 15]. However, on the evidence bag containing what Officer Jordan believed to be heroin, which was located within the safe, Officer Jordan wrote a time entry of 11:28 [*Id.*]. And at the suppression hearing, Officer Jordan claimed that this time entry meant 11:28 p.m. [*Id.*]. Defendant argues that Officer Jordan must have realized the handwritten entry of 11:28 "had to be pm; otherwise, he would have openly admitted he opened the safe, searched it, and bagged the items . . . before applying for a search warrant" [*Id.*].

Defendant also notes that a photograph taken of the safe, where the evidence seal on the safe is not broken, bears, "Taken: 01/21/2023 23:48" [*Id.*]. "While attempting to

explain this away, Officer Jordan admitted that his handwritten return regarding the search warrant was made on January 21, 2023, at 22:00 some one hour and 48 minutes before the photograph of the unbroken evidence tap was 'taken'" [*Id.*]. But, defendant emphasizes, Officer Jordan swore under oath in his search warrant affidavit that the search of 2309 Dodson Avenue occurred on January 21, 2023 [*Id.*]. Ultimately, defendant submits that these facts show that Officer Jordan searched the safe prior to applying for and obtaining a search warrant [*Id.* at 16].

In response, the government avers that defendant is basing his argument on a "typographical error noting the incorrect date in the search warrant affidavit[,]" and that the Magistrate Judge properly concluded that such error was not intentional or reckless [Doc. 97, p. 4]. And, at the end of the day, there was probable cause to search the safe [*Id.*].

First, the Court observes that defendant's objections here could be construed as an overarching objection to the Magistrate Judge's implicit findings of credibility as to Officer Jordan. Specifically, at the suppression hearing, defense counsel questioned Officer Jordan at length about his documentation related to the search warrant for the safe [*See* Doc. 92, pp. 95–100]. In asking these questions, it is apparent that defendant was aiming to place doubt on the propriety of the search of the safe, specifically as to when it occurred in relation to the procurement of a search warrant [*See id.* at 115 ("[I]t's [defendant's] position that . . . the safe was searched prior to the issuance of the search warrant.")]. The Magistrate Judge, in the "Summary of the Evidence" section of the R&R, synthesized defense counsel's questions about the search of the safe and Officer Jordan's corresponding

35

answers [*See* Doc. 90, pp. 22–24].  However, as noted by defendant, the Magistrate Judge made no findings of fact as to the alleged "inconsistencies" defense counsel claims to have brought to light during the suppression hearing.

The Court finds that this absence amounts to an implicit finding of credibility on the part of Officer Jordan as it reflects an acceptance of the explanations provided by Officer Jordan when defense counsel questioned his documentation and the time entries of such documentation.  Though defendant may ultimately disagree with Officer Jordan's explanations, the R&R communicates its belief of such explanations.

"When a magistrate's findings and recommendations rest upon the evaluation of the credibility of a witness, the district court is not required to rehear the testimony in order to conduct a de novo determination of the issues." *United States v. Johnson*, No. 10-20176, 2011 WL 3844194, at *2 (W.D. Tenn. Aug. 30, 2011) (quoting *United States v. Bermudez*, 228 F.3d 424, 2000 WL 1871676, at *3 (6th Cir. Dec. 11, 2000)).  The Court notes that "[i]t has long been the practice of our judicial system to leave credibility determinations to the fact finder best equipped to make those determinations." *United States v. Caldwell*, No. 1:13-CR-128, 2015 WL 179583, at *2 (E.D. Tenn. Jan. 14, 2015) (applying this principle to a magistrate judge's credibility finding from a suppression hearing).

"When reviewing a magistrate judge's credibility determinations on a motion to suppress, the district court may accept or reject the magistrate judge's determination, while recognizing a magistrate judge is in the better position to assess the credibility of witnesses [s]he sees and hears." *United States v. Robinson*, No. 1:07-CR-1, 2007 WL 2138635, at *1 (E.D. Tenn. July 23, 2007) (citing *United States v. Ailemen*, 986 F. Supp. 1228, 1231

(N.D. Cal. 1997)). "Credibility determinations of the magistrate judge who personally listened to the testimony of a witness should be accepted by a district judge unless in his de novo review of the record he finds a reason to question the magistrate judge's assessment." *Id.* (citing *Blizzard v. Quillen*, 579 F. Supp. 1446, 1449 (D. Del. 1984)).

Here, Judge McCook did not find the alleged inconsistencies raised by defendant at the suppression hearing to amount to a meritorious argument. And she came to such implicit finding after reviewing the documentation brought forth at the suppression hearing and listening to Officer Jordan's testimony, wherein she was in the best position to judge his credibility.

Furthermore, the Court's review of the record now does not reveal a reason to question Judge McCook's assessment, even considering what defendant highlights in his objection. First, as to the search warrant and the supporting affidavit, Officer Jordan admitted that he had made a typographical error when writing that the search of 2309 Dodson had occurred on January 21, 2023, rather than January 20, 2023 [Doc. 92, p. 51]. Ultimately, the Magistrate Judge found such error to be negligent rather than reckless or intentional, noting that "Officer Jordan began preparing his affidavit at the end of his shift in the early morning of January 21, 2023" [Doc. 90, p. 55]. And defendant here has not meaningfully challenged this finding. Notably as well, the affidavit was signed by the magistrate judge on January 21, 2023, at 7:25 p.m., and the search warrant a minute later at 7:26 p.m. [*See* 63-1, pp. 4, 8]. The cover sheet for the search warrant and affidavit indicate that the return of the search warrant occurred on January 21, 2023, at 22:00 (i.e., 10:00 p.m.) [*Id.* at 1].

Turning then to the PIR, defendant is correct that the handwritten date on the document is January 20, 2023, at 18:35 (i.e., 6:35 p.m.). Relevantly, this date and time appear to align with the start of Officer Jordan's body camera footage during the parole compliance search [*See* Doc. 92, p. 42 ("Q. And what's the timestamp there? A. That's 1834 and 56 sec—sorry—57 seconds. So, it would be 6:34; just before 6:35 p.m."). In other words, the time provided by Officer Jordan on the PIR appears to be the time the parole search was initiated. Ultimately, this cuts against defendant's contention that Officer Jordan wrote the list at the time he "prematurely" opened the safe. Specifically, defendant does not contend that Officer Jordan opened the safe at the time of the search, but rather that Officer Jordan opened the safe after seizing it from the residence and transporting it to KPD's building [*See* Doc. 92, pp. 51–52]. Thus, if defendant's contention were to be true, the Court would expect a later time to be listed on the PIR, not the time the search of the residence occurred. Additionally, and as noted previously, defendant contends that this PIR is not a continuation of the inventory Officer Jordan claimed he started during the parole search [Doc. 96, p. 14]. Defendant fails to consider, however, Officer Jordan's statement at the suppression hearing, that, while the Ruger LC9 firearm was listed as the first item, the barcode for the firearm listed it as the tenth item in the inventory sequence [*See* Doc. 92, pp. 96–97].

Next, defendant raises the issue of Officer Jordan failing to use military time when writing the time entry for the "narcotics envelope" [Doc. 96, p. 15].[11] Specifically, the date

---

[11] For clarity, the "narcotics envelope" pertains to the 688 grams of what was believed to be heroin, which was found within the safe.

and time notation for the sealing of the envelope was 11:28 [Doc. 92, p. 99]. While Officer Jordan stated that the time was to be followed by p.m., defendant asserts that Officer Jordan only said this to conceal the fact that he had opened the safe before obtaining a warrant [Doc. 96, p. 15]. While the Court acknowledges that Officer Jordan uses military time for other relevant documentation [*see*, *e.g.*, Doc. 63-1], defendant's contention does not make sense in conjunction with the time notation for when the narcotics were found. Specifically, as set out at the suppression hearing, Officer Jordan testified that the narcotics were found on January 21, 2023, at 8:00 p.m., and this time notation is apparent on the envelope [Doc. 92, pp. 98–99]. Defendant does not dispute this fact. Yet, defendant offers no explanation as to why Officer Jordan would properly list the narcotics as found at 8:00 p.m., after the warrant was issued, but later on the same envelope list 11:28 a.m. as the time the envelope was entered and sealed. And the Court can find none here. At best, the Court concludes that Officer Jordan's non-use of military time was a late-night mistake.

Finally, defendant takes issue with the warrant being returned at 22:00 (10:00 p.m.) on January 21, 2023, but the photograph of the sealed safe being "taken" at 23:48 (11:48 p.m.) [Doc. 96, p. 15]. But as explained by Officer Jordan at the suppression hearing, the photograph was not "taken" at 11:48 p.m.; rather, this was the time that Officer Jordan uploaded his photograph for continuation his police report [Doc. 92, p. 100]. Defendant provides no evidence to the challenge this assertion, nor does the Court find any reason to question Officer Jordan's testimony.

Accordingly, for all the reasons set forth above, the Court sees no reason to disturb Judge McCook's recommendation, and therefore, defendant's objections here are **OVERRULED**.

### C. Search of the Cell Phone

Moving on to the search of defendant's cell phone, defendant provides that he disagrees with and objects to the R&R's findings that (1) a nexus exists, and (2) the good faith exception applies [Doc. 96, p. 16]. The Court will begin with defendant's objection to the existence of a nexus.

#### 1. Nexus

First, defendant asserts that the R&R "does not explicitly find that the affidavit in support of the August 2023 search warrant provides a nexus, to wit, a fair probability that the phone data will aid in a particular investigation and disclose evidence of criminal activity" [Doc. 96, p. 17 (citation and internal quotation marks omitted)]. Rather, the R&R finds that the affidavit *arguably* provides a nexus under this standard [*Id.*]. However, defendant avers, this is not the case [*Id.*]. As his main example of this nexus absence, defendant emphasizes the time span between (1) when the phone was seized and the observation was made that such phone was receiving "numerous calls and text messages" and (2) when Officer Chandler swore to the affidavit [*Id.*]. And as to the remaining assertions in the affidavit, defendant contends that they neither individually, or in combination, establish the required nexus [*Id.*]. Ultimately, defendant argues that allowing

40

a mere three references[12] to provide the required nexus would "allow law enforcement to simply include these three statements in their affidavits, without more, only to have their affidavits upheld and unchallenged [Doc. 96, p. 18].[13]

In response, the government asserts that the affidavit here established a sufficient nexus [Doc. 97, p. 5]. Specifically, the government points to the "common-sense inference" that, in the case of drug dealers, evidence of their dealing is likely to be found in their home [*Id.* (citations omitted)]. And applying that inference to the case here, the government submits that defendant's cell phone was seized on his person right after leaving the residence in which law enforcement found evidence of drug trafficking [*Id.* at 5–6]. Moreover, when defendant's phone was seized, the phone received multiple phone calls and text messages [*Id.* at 6]. Taking all of this into consideration, the government avers that evidence of probable cause exists here [*Id.*].

Ultimately, the Court need not rule on defendant's objection as to a nexus finding given the Court's finding *infra* of the application of the good-faith exception. Therefore, defendant's objection here is **OVERRULED**.

---

[12] The "three references" defendant cites to are (1) that in Officer Chandler's training and experience, "persons engaged in drug trafficking use cell phones" to coordinate drug transactions; (2) that defendant's cell phone was seized after defendant left the residence in which drugs and drug paraphernalia were found; and (3) that when the cell phone was seized, it received "numerous calls and messages" [Doc. 90, p. 48].

[13] Though the R&R provided that the affidavit arguably *does not* provide a nexus under the second standard set out by the appellate court [*see* Doc. 90, p. 49], defendant also contends that the affidavit here does not meet this second standard.

41

## 2. Good-Faith Exception

As noted above, defendant also objects to the R&R's conclusion that "law enforcement executed the search for the warrant for the [d]efendant's cell phone in good faith" [Doc. 96, p. 18 (quoting Doc. 90, pp. 49–51)]. In support of this objection, defendant contends that Officer Chandler's affidavit is bare bones and "lacks the modicum of evidence required to allow a court to uphold a search based upon a search warrant that is later invalidated" [*Id.*]. To these points, defendant first takes issue with the R&R's mention that the affidavit at issue, from August 2023, is the second affidavit [*see* Doc. 90, p. 51]. Defendant diminishes this fact, asserting that both affidavits are substantively the same [Doc. 96, p. 18]. Second, defendant turns back to the proof presented at the suppression hearing, that is, that defendant did not exit the front right bedroom [*Id.*].

The government, in response, argues that Officer Chandler's affidavit is not bare bones, and that it contains a modicum of evidence supporting the required nexus [Doc. 97, p. 6]. Thus, law enforcement had a good-faith belief that the affidavit contained probable cause [*Id.*].

As provided by the R&R, the good-faith exception to the exclusionary rule for evidence "does not apply when an officer executing a search warrant relies on a warrant affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *United States v. Nobel*, No. 24-5972, 2025 WL 1410331, at *2 (6th Cir. May 15, 2025) (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)). These types of affidavits are also referred to as "bare bones" affidavits. In more detail, the Sixth Circuit has described a bare bones affidavit as:

one that states only suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge. Put more simply, a bare-bones affidavit is a conclusory affidavit, one that asserts only the affiant's belief that probable cause existed. It provides nothing more than a mere guess that contraband or evidence of a crime would be found [and is] either completely devoid of facts to support the affiant's judgment that probable cause exists, or so vague as to be conclusory or meaningless.

*United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (internal quotation marks and citations omitted).

However, an affidavit is not bare bones if it contains "even a 'modicum of evidence, however slight, showing *some* connection, regardless of how remote it may have been between the criminal activity at issue and the location of the search.'" *Nobel*, 2025 WL 1410331, at *2 (emphasis in original) (quoting *United States v. Sanders*, 106 F.4th 455, 469 (6th Cir. 2024)). Here, the R&R found the warrant affidavit for defendant's cell phone to contain a modicum of evidence supporting a nexus, citing to the substantial evidence of drug trafficking seized from the residence, the affiant's training and experience, defendant's possession of the cell phone in close proximity to the controlled substances and drug trafficking paraphernalia, and the cell phone receiving multiple calls and text messages upon seizure [Doc. 90, pp. 50–51].

The Court begins with the four corners of the affidavit. Foremost, the affidavit provides that there is "reason to believe" that the cell phone, asserted to have been in the control of defendant, includes stored information constituting evidence of criminal activity, including:

text messages, voice messages, other means of electronic communication including social media messages and emails relating to the distribution of

43

> controlled substances; records of incoming and outgoing calls from drug customers and suppliers, stored telephone numbers for, photographs of, and other information relating to co-conspirators, customers, suppliers, and the defendant

[Doc. 42-2, p. 2]. Then, the affidavit moves to focus on the training and experience of the affiant. Specifically, the affidavit provides that Officer Chandler (1) has been in the field of law enforcement for more than five years; (2) has, while assigned to patrol, worked numerous felony drug and firearms cases; (3) has attended specialized training and seminars related to drug investigations, trends, arrests, and prosecutions; and (4) has been assigned to the CERT team since April 2021 "in an effort to combat violent crime by focusing on target areas" including drug-related offenses [*Id.* at 2–3]. Officer Chandler also submits, as the affiant, that during his time in law enforcement, he has conducted "numerous investigations for possession of controlled substances for resale" [*Id.* at 3]. And based on all of his training and experience, Officer Chandler avers that he knows that persons involved in the sale of controlled substances maintain and use cell phones "as a way to communicate with their customers and suppliers, as well as set up and coordinate meeting times and locations to sell and/or obtain additional quantities of controlled substances" [*Id.*].

Turning then to the underlying allegations, the affidavit provides that law enforcement took defendant into custody upon making contact with him at his residence [*Id.* at 4]. And during a search of defendant's person incident to his arrest, Officer Jordan removed a blue Apple iPhone from defendant's pants pocket [*Id.*]. The affidavit then offers

44

the details of the search and lays out what was uncovered by law enforcement within the residence:

> multiple small baggies, a box of zip lock bags, three digital scales, a razor blade, a spoon with residue on it, . . . a monster energy can that is used as a hidden safe[,] . . . 23 plastic bags each containing a powdery substance with a total weight of 14.7 grams . . . believed to be heroin[,] . . . a clear plastic bag that weighed 57.8 grams, which contained a white substance . . . indicated [ ] to be cocaine[,] . . . a glass pipe[,] and a marijuana grinder.

[*Id.* at 5]. In addition to drug paraphernalia and controlled substances, the affidavit also notes that law enforcement found an AR-15, an AR-15 magazine, and a box of 9mm ammunition [*Id.* at 5]. The affidavit further states that during the search of the residence, the cell phone seized from defendant "received numerous calls and text messages" [*Id.*].

Next, the affidavit provides that a safe was seized during the search, and that this safe was searched pursuant to a warrant obtained by Officer Jordan [*Id.*]. This search revealed "three large bags of a grey substance that is believed to be heroin weighing a total of 688 grams, 26 grams of an off[-]white powder substance that is believed to be cocaine, and a Ruger LC9S handgun chambered in 9mm" [*Id.* at 6]. The affidavit states that, based on the suspected controlled substances and the drug paraphernalia, law enforcement believe that defendant is engaged in the sale and/or distribution of controlled substances, and that the firearms found are being used to protect defendant's interest in drug sales [*Id.*]. Finally, taking all of this into consideration, the affidavit represents that law enforcement have reason to believe that the cell phone seized from defendant was being used for the sale and/distribution of controlled substances and to facilitate drug transactions [*Id.*].

Returning to the good-faith exception, the Court reiterates that an affidavit in support of a warrant can only be considered "bare bones" when there exists "no reasonable grounds for believing that the warrant was properly issued." *White*, 874 F.3d at 506 (quoting *Leon*, 468 U.S. at 922–23). Ultimately, this is a low bar, requiring only a "'modicum of evidence, however slight' connecting the illegal activity and the place to be searched." *United States v. Neal*, 106 F.4th 568, 572 (6th Cir. 2024) (quoting *White*, 874 F.3d at 496–97). And notably, "reasonable inferences that are not sufficient to establish probable cause in the first place may suffice to save the ensuing search as objectively reasonable." *White*, 874 F.3d at 500.

Here, the supporting affidavit contained a substantial amount of detail as to the drug trafficking evidence discovered at defendant's residence and explained what the relevance would be of any information contained in defendant's cell phone to the investigation of such criminal activity. The supporting affidavit also implicitly established a proximity between the cell phone and the drug trafficking evidence in noting that defendant's cell phone was seized after making contact with defendant at his residence, i.e, the location of the contraband. *See United States v. Lavallis*, 515 F. Supp. 3d 686, 692 (E.D. Mich. 2021) (nothing that a "number of decisions have concluded that probable cause to search a cell phone exists simply because cell phones discovered in proximity to crime or contraband almost invariably contain incriminating evidence." (quoting *United States v. Harris*, No. 15-0170, 2016 WL 1441382, at *11–12 (E.D. Va. Apr. 11, 2026))); *see also United States v. Metzger*, No. 5:21-CR-885, 2022 WL 3597883, at *7 (N.D. Ohio Aug. 23, 2022) ("That the phone in question was discovered in the same apartment where officers found suspected

46

drugs, a scale, and drug paraphernalia would have further reinforced an officer's reasonable belief that [the defendant's] cell phone could be searched pursuant to the warrant and the drug investigation.").

Furthermore, the affiant set forth in detail how his training and experience in drug-related offense investigations lends to his knowledge that individuals involved in drug trafficking maintain and utilize cell phones to communicate with their suppliers and customers. *See also United States v. Rolling*, No. 23-1045, 2024 WL 4512532, at *4 (6th Cir. Oct. 17, 2024) (citation omitted) ("Even if the judge's inference that the phone itself was used in planning or discussing the robberies and would thus contain evidence of crime was too tenuous to support a finding of probable cause, it was not too great a leap for good faith reliance.").

The Court finds that these articulated allegations, in combination with the affiant's training and experience, establish a "minimally sufficient nexus" between the alleged drug trafficking and the cell phone to be searched "sufficient to support the executing officers' good faith belief that the warrant was valid." *Metzger*, 2022 WL 3597883, at *7 (first citing *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (en banc); and then citing *White*, 874 F.3d at 496). In total, this "is not a case in which a 'simple glance' at the warrant would reveal deficiencies glaring enough to make reliance on it unreasonable." *United States v. Castro*, 881 F.3d 961, 966 (6th Cir. 2018) (quoting *United States v. Watson*, 498 F.3d 429, 432 (6th Cir. 2007)). Rather, when viewing the totality of the circumstances and considering all reasonable inferences, the affidavit contains a modicum of evidence connecting the "illegal activity and the place to be searched." *Neal*, 106 F.4th

47

at 572; *accord United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004) (citation omitted) ("The affidavit should be reviewed in a commonsense—rather than hypertechnical—manner, and the court should consider whether the totality of the circumstances supports a finding of probable cause, rather than engaging in line-by-line scrutiny."). Furthermore, and as evidenced by the above, the Court need not rely on the affidavit's allegation of defendant's position in the house or consider that the affidavit at issue is the second one of its kind to come to this conclusion. Thus, defendant's objection here is **OVERRULED**.

### D. *Franks* Challenge

Defendant generally objects to the R&R's conclusion that he failed to make a substantial preliminary showing regarding the affidavits of Officers Jordan and Chandler [Doc. 96, p. 19]. The Court will begin with the asserted false statements in Officer Jordan's affidavit.

### 1. Asserted False Statements in Officer Jordan's Affidavit

As to Officer Jordan, defendant submits that:

> Swearing under oath that the dates in a search warrant affidavit for ripeness purposes (as opposed to staleness) of information relating to an alleged theft of an AR-15 rifle, the incorrect date of the "parole" search when the safe was already opened prior to the execution of the affidavit in support of the search of the safe, the untruth that [defendant] exited the right front bedroom where all the contraband was found, and the fact that [defendant] refused to open the safe when he clearly cooperated with law enforcement by placing a finger or thumb on the safe at their request are false statements by Officer Jordan that are both material to and affect probable cause.

[Doc. 96, p. 19]. Specifically, beginning with the AR-15 rifle, defendant contends that by stating the incorrect date of the stolen firearm, "Officer Jordan made the information appear

48

more ripe than it was" [*Id.*].  Next, defendant argues that by stating the incorrect date of the "parole" search, "Officer Jordan gave the appearance that the seizure of the safe occurred on the same date he applied for the search warrant" [*Id.* at 19–20].  Defendant further avers that Officer Jordan "created the appearance that [defendant] was involved with the contents of the AR-15, backpack, toolbox, and safe" by incorrectly stating that defendant exited the right front bedroom where all the contraband was discovered [*Id.* at 20].  And finally, defendant asserts that by misstating defendant's assistance with opening the safe, Officer Jordan created the appearance that defendant "had something to hide" [*Id.*].  All of these statements, defendant maintains, were false and material to probable cause [*Id.*].

Starting with the date of the theft of the AR-15 rifle, defendant, for the first time, raises an argument as to information "ripeness."  Again, "absent compelling reasons," parties may not "raise at the district court stage new arguments or issues that were not presented to the magistrate." *Murr*, 200 F.3d at 902 n.1 (citing *Waters*, 158 F.3d at 936); *accord Burney*, 2024 WL 987877, at *3.  Therefore, defendant's objection here is waived. *Burney*, 2024 WL 987877, at *3 (citation omitted).

Even if the objection were not waived, it is without merit.  The relevant portion of Officer Jordan's affidavit states that on January 8, 2023, "Officers in Teleserve at the Knoxville Police Department received a call from the victim of a theft, Pacifique Byishimo, who stated that [a] male named Daniel Rose came to his apartment to visit his sister.  The victim left the room but when he returned, Daniel Rose and his AR-15 that was in the apartment were missing" [Doc. 63-1, p. 3].  As stated by the R&R, defendant argued in his

49

briefing that the date of the alleged theft of firearm, the AR-15, was October 14, 2022 [Doc. 90, p. 54]. The R&R acknowledged that the Parole Violation Report introduced by defendant stated that he committed the alleged theft on October 14, 2022; however, the R&R also noted that:

> the narrative contained in the report states that on January 10, 2023, KPD Officer J. Clabough interviewed the victim, who reported that on January 8, 2023, the suspect, whom he did not know, came to his residence to visit a friend who lived at the residence but who was not home. While the victim was upstairs, the suspect left and the victim's "AR-15 style rifle" that was beside his couch was gone. Officer Clabough also interviewed the victim's girlfriend, who stated that she saw the suspect grab the gun and leave the apartment. The victim and his girlfriend also positively identified Defendant through a photo lineup.

[*Id.* at 54–55 (citing Doc. 63, p. 10) (internal citations omitted)]. Ultimately, based on the above, the R&R concluded that the Parole Violation Report showed that the January 8, 2023, date in Officer Jordan's affidavit was not false [*Id.* at 55].

The Court concludes the same. Officer Jordan's affidavit did not state that the alleged theft occurred on January 8, 2023, but rather that the victim reported the theft on such date, which aligns with the contents of the Parole Violation Report [*See id.* at 54–55; Doc. 63-1, p. 3]. Therefore, defendant's objection, which is predicated on Officer Jordan's affidavit stating that the alleged theft occurred on January 8, 2023, is **OVERRULED**.

Next, as stated previously, defendant submits that Officer Jordan's use of the incorrect date of the "parole" search gave the appearance that the seizure of the safe occurred on the same day Officer Jordan applied for the search warrant. The Courts finds that this objection and supporting argument here to be a reiteration of that which defendant raised in his previous briefings and at the December 2, 2024, hearing [*See* Doc. 63, p. 11;

50

Doc. 92, pp. 114–115 ("The affidavit provides that Officer Jordan and others went to the residence on January 21st, 2023. It's our position to portray that the safe was not searched prior to the affidavit in support of the search warrant. . . . [H]ow does something found on January 20th, 2023, in a safe and placed on an inventory reenter a secured safe at 11:48 p.m. the next day and after the search warrant is issued?")]. Accordingly, defendant's objection is improper and is in turn, **OVERRULED**. *See Dawson*, 2020 WL 109137, at *1.

As stated above, defendant further asserts that, by incorrectly stating that defendant exited the right front bedroom where all the contraband was discovered, Officer Jordan "created the appearance that [defendant] was involved with the contents of the AR-15, backpack, toolbox, and safe" [Doc. 96, p. 20]. Reviewing defendant's request for a *Franks* hearing [Doc. 63],[14] and what defendant presented at the December 2, 2024, hearing [Doc. 92], this is the first time defendant raises the above argument, making his objection improper. *See Murr*, 200 F.3d at 902 n.1 (citation omitted); *Burney*, 2024 WL 987877, at *3. Moreover, defendant does not challenge the R&R's specific finding that "[e]ven if the statements that an officer saw [d]efendant emerge from the right front bedroom are false, they are not material to probable cause that evidence of drug trafficking would be found in the safe" [Doc. 90, p. 57]. Rather, the R&R provides, probable cause "comes from the

---

[14] The Court acknowledges defendant's argument that Officer Jordan's false statements were included in the affidavit with the "intent to mislead the magistrate judge" [Doc. 63, p. 8]. However, defendant does not expand on this "intent to mislead" until his instant objection before the Court.

51

safe's proximity to drugs, a firearm, and the other items of drug trafficking found in the bedroom" [*Id.*].

Additionally, defendant provides only a conclusory statement as to probable cause which "does not meet the requirement of [a] specific objection[] and is tantamount to a complete failure to object" [*See* Doc. 96, p. 19 ("Swearing under oath . . . the untruth that [defendant] exited the right front bedroom where all the contraband was found . . . [is a] false statement[] by Officer Jordan that [is] both material to and affect[s] probable cause.") *Fields v. Lapeer 71-A Dist. Ct. Clerk*, 2 F. App'x 481, 483 (6th Cir. 2001) (citing *Miller*, 50 F.3d at 380). Accordingly, defendant's objection here is **OVERRULED**.

Finally, defendant contends that Officer Jordan created the appearance that he "had something to hide" by misstating defendant's assistance with opening the safe [Doc. 96, p. 20]. This argument fails for the same reason as defendant's above objection. Specifically, this is the first time defendant raises the specific argument of Officer Jordan's intent to mislead the magistrate judge by creating the appearance that defendant was hiding something. *See Murr*, 200 F.3d at 902 n.1 (citation omitted); *Burney*, 2024 WL 987877, at *3. Furthermore, defendant only provides a conclusory statement as to how this asserted false statement is material to and affects probable cause [Doc. 96, p. 19 ("Swearing under oath . . . the fact that [defendant] refused to open the safe when he clearly cooperated with law enforcement by placing a finger or thumb on the safe at their request [is a] false statement[] by Officer Jordan that [is] both material to and affect[s] probable cause.")]. And as discussed above, a conclusory objection "is tantamount to a complete failure to object." *Fields*, 2 F. App'x at 483. Additionally, defendant's argument does not address

52

the R&R's determination that defendant's "connection or lack thereof to the safe does not affect the probable cause to search it" [Doc. 90, p. 58]. Accordingly, defendant's objection here is **OVERRULED**.

Defendant also objects to the R&R "not considering his Affidavit in support of his substantial showing in this regard" [Doc. 96, p. 20]. The R&R acknowledged defendant's submission of his own affidavit, noting that it "constitute[d] his offer of proof that the statements are false or are material and omitted" [Doc. 90, p. 40 (citing Doc. 63-4)]. To the extent the R&R did not cite to defendant's affidavit in its analysis of the alleged false statements within Officer Jordan's affidavit, the Court does not find this to mean that defendant's affidavit was excluded from consideration. *See West v. Palmer*, No. 1:10-CV-1296, 2013 WL 1213416, at *1 (W.D. Mich. Mar. 25, 2013) (concluding that, although "neither Respondent's Answer nor Petitioner's Traverse were cited in the Report and Recommendation, this is not necessarily evidence that they were 'excluded from consideration'"). Therefore, defendant's objection here is also **OVERRULED**.

### 2. Asserted False Statements in Officer Chandler's Affidavit

Turning to Officer Chandler's affidavit, defendant objects to the R&R's conclusion that he failed to make a substantial preliminary showing that Officer Chandler intentionally or recklessly included false statements in his affidavit that are material to the probable cause finding [Doc. 96, pp. 20–21]. As to this objection, defendant contends that:

> Swearing under oath the incorrect purpose of going to 2309 Dodson Avenue, that [defendant] was seen by two officers exiting the right front bedroom where all the contraband was found, that the right front bedroom was [defendant's] when no one could determine that and Ms. Netherland said it was her room, that the officers located a toolbox in the bathroom attached to

53

> *defendant's* bedroom, that the residence at 2309 Dodson Avenue was *defendant's* home, and that the safe was first opened on January 21, 2023, instead of January 20, 2023, are false statements by Officer Chandler that are both material to and affect probable cause.

[*Id.* at 20 (emphasis in original)].[15]

After carefully reviewing the record, the Court finds that defendant's objection regarding Officer Chandler's alleged false statements merely reiterates arguments he previously made and which the Magistrate Judge already considered [*See* Doc. 63, pp. 16–18; Doc. 92, pp. 114, 120–122]. "[A]n objection to an R&R is not meant to be simply a vehicle to rehash arguments set forth in the petition, and the Court is under no obligation to review de novo objections that are merely an attempt to have the district court reexamine the same arguments set forth in the petition and briefs." *Dundee v. Univ. Hosps. Corp*, No. 1:19-CV-1141, 2020 WL 511520, at *1 (N.D. Ohio Jan. 31, 2020) (citing *Howard*, 932 F.2d at 509); *accord Rhodus v. Comm'r of Soc. Sec.*, No. 1:19-CV-217, 2020 WL 5517257, at *1 (S.D. Ohio Sept. 14, 2020) (quoting *Howard*, 932 F.2d at 509) ("[O]bjections that recite arguments made to the magistrate judge effectively duplicate the functions of the district court 'as both the magistrate and the district court perform identical tasks. This duplication of time and effort wastes judicial resources rather than saving them, and runs

---

[15] Defendant also again objects to the R&R "not considering his Affidavit in support of his substantial showing in this regard" [*Id.* at 21]. Given this is an identical objection to the one discussed in Section III.D.1, this objection is similarly **OVERRULED**.

contrary to the purposes of the Magistrates Act.'"). Therefore, defendant's objection is improper and accordingly, **OVERRULED**.[16]

### 3. Omissions from the Officers' Affidavits

Next, defendant objects to the R&R's conclusion that he failed to make a substantial showing that the affidavits of Officers Jordan and Chandler omitted information material to a finding of probable cause [Doc. 96, p. 21]. In support of this objection, defendant provides that he set forth "a detailed and substantial showing that a *Franks* hearing was warranted in this case[,]" including his own affidavit [*Id.* (citations omitted)]. Given that the Magistrate Judge has already thoroughly considered defendant's referenced "showing," defendant's objection to the R&R here is **OVERRULED**. *See Dundee*, 2020 WL 511520, at *1 (citing *Howard*, 932 F.2d at 509); *Rhodus*, 2020 WL 5517257, at *1 (citation omitted).

### E. Voluntariness of Statement

Finally, defendant objects to the R&R's conclusion that his statements to Officer Jordan "were volunteered and not the product of an interrogation" [Doc. 96, p. 21]. Specifically, defendant contends that Officer Jordan interrogated him by stating, "people who take heroin and overdose have families, too[,]" and that Officer Jordan should have known that this statement was reasonably likely to elicit an incriminating response [*Id.* at 22]. Defendant asserts that there was no reason for Officer Jordan's statement other than

---

[16] As with defendant's objection in Section III.D.1, defendant also provides the Court with only a conclusory assertion as to how the alleged false statements in Officer Chandler's affidavit are material to probable cause.

to attempt to obtain a response by defendant that could later be used at trial [*Id.*]. And therefore, given Officer Jordan's words were an interrogation, defendant's response should be suppressed [*Id.*].

In response, the government submits that the R&R correctly concluded that defendant's statement was a volunteered statement unprovoked by interrogation, and even if the comment was interrogation, defendant validly waived his *Miranda* rights [Doc. 97, pp. 6–7].

Implicit in defendant's objection is the contention that he had either (1) not validly waived his *Miranda* rights or (2) invoked his *Miranda* rights by the time Officer Jordan made the statement that "people who take heroin and overdose have families, too" [*See* Doc. 90, p. 59]. Otherwise, defendant's response to Officer Jordan's alleged interrogation would be admissible. *See United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) (citing *Miranda v. Arizona*, 384 U.S. 436, 478–479 (1966)) ("Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprised of the constitutional right against self-incrimination and has validly waived that right."); *Bachynski v. Stewart*, 813 F.3d 241, 246 (6th Cir. 2015) (citing *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981)) ("After a suspect invokes [his] right to counsel, police may not initiate an 'interrogation' of the suspect without counsel present."). Despite this, defendant's objection provides no argumentation as to why the R&R's determination that, even if Officer Jordan's comment was interrogation, "[d]efendant validly waived his *Miranda* rights and had not invoked them or had revoked any prior

56

invocation by initiating a case-related discussion at the time of this statement" is incorrect [Doc. 90, p. 64].

Moreover, what defendant does include in his objection is largely a reiteration of the argument he raised in his previous briefing and at the December 2, 2024, hearing [*See* Doc. 66, p. 2 ("Officer Jordan knew or should have known that his words regarding people who overdose on drugs were reasonably likely to illicit an incriminating response from [defendant]."); Doc. 92, p. 122 ("It's our position that the motion should be granted; that Officer Jordan's comments were likely to elicit an incriminating response.")].  Only here, defendant argues that there is no *other* reason for Officer's Jordan statement than to have elicited an incriminating response from defendant.  However, this conclusory assertion, without more, "does not meet the requirement of [a] specific objection[] and is tantamount to a complete failure to object."  *Fields*, 2 F. App'x at 483 (citing *Miller*, 50 F.3d at 380). Accordingly, defendant's objection to the R&R here is **OVERRULED**.

## IV.    Conclusion

For the reasons set forth above, defendant's objections [Doc. 96] are **OVERRULED**.  The Court **ACCEPTS** and **ADOPTS** the R&R [Doc. 90] in whole and **DENIES** defendant's motions [Docs. 42, 63, 66].

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE